THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CRIMINAL CASE NO. 1:11-cr-00029-MR

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **O R D E R** |
| ) | |
| BILLY DEAN TESSENEER, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's "Emergency Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i0 as a Result of COVID-19" [Doc. 58]; the Defendant's "Addendum to the Emergency Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) as a Result of COVID-19" [Doc. 63]; and the Government's Motion to Seal Exhibit to Response [Doc. 66]. The Government opposes the Defendant's motion for compassionate release. [Doc. 64].

**I.    BACKGROUND**

In June 2011, the Defendant Billy Dean Tesseneer pled guilty to one count of possession with intent to distribute methamphetamine. [Doc. 16]. In January 2013, the Court sentenced him to 220 months of imprisonment to be followed by six years of supervised release. [Doc. 31]. The Defendant is

currently housed at USP Canaan, and his projected release date is June 2, 2027.[1]

The Defendant now seeks a reduction in his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) in light of the ongoing COVID-19 pandemic. [Doc. 186]. Specifically, the Defendant argues that his underlying health conditions place him at a higher risk for severe illness from COVID-19, and that his particular vulnerability to the illness is an extraordinary and compelling reason for an immediate sentence reduction to time served. [Id.].

## II. DISCUSSION

### A. Motion for Compassionate Release

Section 3582(c)(1)(A), as amended by The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), permits a defendant to seek a modification of his sentence for "extraordinary and compelling reasons," if the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §

---

[1] See https://www.bop.gov/inmateloc/ (last visited Dec. 8, 2020).

2

3582(c)(1)(A). Here, the Government concedes that the Defendant has exhausted the necessary administrative remedies. Accordingly, the Court will proceed to address the merits of the Defendant's motion.

As is relevant here, the Court may reduce a defendant's sentence under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons if "such reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), to the extent that such factors are applicable. Id.

Section 1B1.13 of the United States Sentencing Guidelines sets forth the Sentencing Commission's policy statement applicable to compassionate release reductions. See U.S.S.G. § 1B1.13. That policy statement, however, was adopted before the First Step Act, and the Sentencing Commission has not updated the policy statement to account for the fact that defendants are now permitted to file their own motions for compassionate release. In light of these circumstances, the Fourth Circuit Court of Appeals has held that § 1B1.13 is no longer an "applicable" policy statement that constrains the discretion of the district courts in finding that "extraordinary and compelling reasons" exists to warrant a reduction in sentence. See

United States v. McCoy, -- F.3d --, 2020 WL 7050097, at *7 (4th Cir. Dec. 2, 2020) ("By its plain terms, . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)"). Thus, this Court is "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise." Id. at *9 (quoting United States v. Zullo, 976 F.3d 228, 230 (2d Cir. 2020).

Here, the Defendant contends that his advanced age (64) and multiple, chronic medical conditions[2]—coupled with the presence and increasing threat of COVID-19—constitute "extraordinary and compelling reasons" for an immediate sentence reduction to time served. While the medical records presented indicate that the Defendant does in fact have each of the conditions complained of, there is no evidence in these records that any of these medical conditions are terminal or limit his ability to provide self-care within the environment of a correctional facility. Moreover, the records indicate that all his conditions are being adequately treated in BOP, and there is no evidence that he is experiencing a serious deterioration in physical health because of these conditions or the aging process.

---

[2] The Defendant contends that he suffers from chronic obstructive pulmonary disease (COPD), obesity, coronary artery disease (CAD), a history of coronary artery bypass graft (CABG) surgery, Type II diabetes mellitus, and hypertension.

4

As for the risk posed to the Defendant by the COVID-19 pandemic, the Court notes that the Federal Bureau of Prisons ("BOP") has taken significant measures to protect the health of its inmates. Since 2012, the BOP has had a Pandemic Influenza Plan in place, which establishes a multi-phase framework for BOP facilities to implement in the event of a viral outbreak.[3] The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control ("CDC"), including by reviewing guidance from the World Health Organization ("WHO"). On March 13, 2020, BOP began to modify its operations, in accordance with its COVID-19 Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.[4]

---

[3] BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 8, 2020).

[4] See generally Federal Bureau of Prisons, COVID-19 Action Plan (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid19.jsp.

The BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters in order to stop any spread of the disease. Only limited group gathering is allowed, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission,

all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors. Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen

8

the greatest incidence of coronavirus transmission. Since March 26, 2020, BOP has transferred 18,547 inmates to home confinement.[5]

Taken together, all these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions while allowing BOP to continue to fulfill its mandate of incarcerating those persons sentenced or detained based on judicial orders. Given the BOP's efforts, the fact that the Defendant faces a potential risk of contracting the virus while incarcerated, without more, is not sufficient to justify his release. United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

For all these reasons, the Court concludes that the Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c)(A)(1)(i).

Even if the Defendant could establish an extraordinary and compelling reason for his release, this Court still must consider the § 3553(a) factors, as

---

[5] See https://www.bop.gov/coronavirus/ (last visited Dec. 8, 2020).

9

"applicable," as part of its analysis of determining whether a sentence reduction is warranted. See § 3582(c)(1)(A); United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020).

Here, the Defendant's offense of conviction was very serious. As the Court noted at sentencing, the offense of conviction involved the distribution of significant amount of methamphetamine, which "is one of the most dangerous, if not the most dangerous drug[s] that we see" in the cases prosecuted in this district [Doc. 40 at 28]. As the Court further noted, methamphetamine "literally destroys people's lives" and "[a]nybody who is involved in the distribution of such a drug needs to be dealt with in a harsh manner." [Id.].

Additionally, the Defendant has a significant criminal history. While he was sentenced as a career offender, he also qualified for the highest criminal history category possible under the Sentencing Guidelines based on his criminal history alone, having amassed a total of 31 criminal history points. The Defendant's extensive criminal history goes back more than forty years and includes felony convictions for Attempted Burning by Incendiary Device, Possession with Intent to Sell and Deliver Marijuana, Possession with Intent to Distribute Marijuana, Possession of a Firearm Not Registered to him in the

10

Case 1:11-cr-00029-MR   Document 68   Filed 12/14/20   Page 10 of 13

National Firearms Registration and Transfer Record (referring to a short-barreled shotgun), and Possession of Methamphetamine. The Defendant also had a number of significant misdemeanor convictions – including Filing a False Affidavit, Driving While Impaired (three convictions), Reckless Driving to Endanger, Carrying a Concealed Weapon, Resisting (two convictions), and Criminal Contempt (two convictions).

In light of the offense conduct and the Defendant's extensive criminal history, the Court concludes that the need for the sentence to reflect the true extent and seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from the defendant's further crimes militate against a sentence reduction in this case.

For all these reasons, the Court finds that there are no "extraordinary and compelling reasons" for the Defendant's release and that analysis of the relevant § 3553(a) factors continue to weigh in favor of his continued incarceration. Accordingly, the Defendant's motion for compassionate release is denied.

11

## B. Motion to Seal

The Government moves the Court for leave to file under permanent seal the BOP medical records [Doc. 65] filed in support of its Response to the Defendant's motion for compassionate release. For grounds, counsel states that the medical records contain highly personal and confidential material concerning the Defendant's medical conditions. [Doc. 66].

Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000). In the present case, the public has been provided with adequate notice and an opportunity to object to the Government's motion. The Government filed its motion on October 29, 2020, and such motion has been accessible to the public through the Court's electronic case filing system since that time. Further, the Government has demonstrated that the subject medical records contain sensitive information concerning the Defendant and that the public's right of access to such information is substantially outweighed by the Defendant's

12

competing interest in protecting the details of such information. See <u>United States v. Harris</u>, 890 F.3d 480, 492 (4th Cir. 2018). Finally, having considered less drastic alternatives to sealing the documents, the Court concludes that sealing of these medical records is necessary to protect the Defendant's privacy interests.

**IT IS, THEREFORE, ORDERED** that the Defendant's "Emergency Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i0 as a Result of COVID-19" [Doc. 58] is **DENIED**.

**IT IS FURTHER ORDERED** that the Government's Motion to Seal Exhibit to Response [Doc. 66] is **GRANTED**, and the medical records submitted in support of the Government's Response [Doc. 65] shall be filed under seal and shall remain under seal until further Order of the Court.

**IT IS SO ORDERED.**

Signed: December 14, 2020

Martin Reidinger
Chief United States District Judge